Aaron D. Aftergood (239853)
  aaron@aftergoodesq.com
**THE AFTERGOOD LAW FIRM**
1880 Century Park East, Suite 200
Los Angeles, CA 90067
Telephone: (310) 550-5221
Facsimile: (310) 496-2840

Taylor T. Smith*
  tsmith@woodrowpeluso.com
**WOODROW & PELUSO, LLC**
3900 East Mexico Avenue, Suite 300
Denver, Colorado 80210
Telephone: (720) 907-7628
Facsimile: (303) 927-0809

*Pro Hac Vice*

Attorneys for Plaintiff and the Class

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SHANA PIERRE,** individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>**IEC CORPORATION D/B/A INTERNATIONAL EDUCATION CORPORATION**, a Delaware corporation,<br><br>          Defendant. | Case No. 8:22-cv-01280-FWS-JDE<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>Hearing: November 17, 2022<br>Time: 10:00 a.m.<br>Courtroom: 10D<br>Judge: Hon. Fred W. Slaughter<br>Complaint filed: July 7, 2022 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iii

I.     INTRODUCTION ....................................................................... 1

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................... 2

III.   ARGUMENT ........................................................................... 5

      A.    Plaintiff's claims are not subject to an enforceable arbitration agreement ............................................................................ 6

           1.    Plaintiff never visited the CollegeAllstar website or agreed to arbitrate any dispute .................................................... 7

           2.    CollegeAllstar.com fails to adequately notify or obtain assent to arbitrate from any user ............................................... 9

      B.    Even if the website's terms were enforceable, Plaintiff's claim would fall outside the scope of the purported agreement ............................. 14

      C.    IEC cannot enforce the arbitration agreement—it is a nonparty to the supposed agreement, and Pierre has done nothing to equitably estop her from denying the agreement's application to her claims .............. 18

      D.    The Court should refuse to grant IEC a special trial on its arbitration defense ............................................................................ 20

IV.   CONCLUSION ...................................................................... 20

# TABLE OF AUTHORITIES

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022)............. 10-13

*Berman v. Freedom Fin. Network, LLC*, Case No. 18-cv-01060-DMR, 2018 WL
    2865561 (N.D. Cal. June 11, 2018) ......................................................5

*Berman v. Freedom Fin. Network, LLC*, No. 18-CV-01060-YGR, 2020 WL
    5210912 (N.D. Cal. Sept. 1, 2020)........................................................5

*Briggs v. PFVT Motors LLC*, No. CV-20-00478-PHX-GMS, 2020 WL 8613676 (D.
    Ariz. Sept. 9, 2020) ....................................................................15, 16

*Brooks v. IT Works Mktg., Inc.*, No. 121CV01341DADBAK, 2022 WL 2079747
    (E.D. Cal. June 9, 2022)................................................................5, 6

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000) ..........5

*Dickey v. Ticketmaster LLC*, No. CV 18-9052-GW(GJSX), 2019 WL 9096443
    (C.D. Cal. Mar. 12, 2019) ....................................................................7

*Drayton v. Toyota Motor Credit Corp.*, 686 F. App'x 757 (11th Cir. 2017)...........18

*Esparza v. SmartPay Leasing, Inc.*, 765 F. App'x 218 (9th Cir. 2019) ..................14

*Est. of Arce by & through Huerta v. Panish Shea & Boyle LLP*, No. 19-CV-0500
    AJB, 2019 WL 6218781 (S.D. Cal. Nov. 20, 2019) ...........................7

*Gamble v. New England Auto Fin., Inc.*, 735 F. App'x 664 (11th Cir. 2018) .........15

*Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733 (9th Cir. 2014) ..................14

*Johnson v. Westlake Portfolio Mgmt., LLC*, No. 8:20-CV-749-T-24 AEP, 2020 WL
    5526386 (M.D. Fla. Sept. 15, 2020) ..................................................18

*Mims v. Glob. Credit & Collection Corp.*,
    803 F. Supp. 2d 1349 (S.D. Fla. 2011) .........................................18, 19

*Morgan v. Sundance, Inc.*, 212 L. Ed. 2d 753, 142 S. Ct. 1708 (2022) .................14

*Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042 (9th Cir. 2009).........................14

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014)....................5, 9, 10

*Qwest Commc'ns Co. LLC v. Sun Coast Merch. Corp.*, No. CV 10-7145 PA (SSX), 2011 WL 13217684 (C.D. Cal. June 13, 2011) ...................................6

*Rahmany v. T-Mobile USA Inc.*, 717 F. App'x 752 (9th Cir. 2018)........................19

*Revitch v. DIRECTV, LLC*, 977 F.3d 713 (9th Cir. 2020)........................................17

*Snow v. Eventbrite, Inc.*, No. 3:20-CV-03698-WHO, 2021 WL 3931995 (N.D. Cal. Sept. 2, 2021) ...................................................................................10

*Stover-Davis v. Aetna Life Ins. Co.*, No. 1:15-CV-1938-BAM, 2016 WL 2756848 (E.D. Cal. May 12, 2016)....................................................................7

**STATUTES & AUTHORITY**

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*................................2

## I.      INTRODUCTION

Defendant IEC Corporation ("IEC") seeks to duck the instant lawsuit and compel Plaintiff Shana Pierre ("Plaintiff" or "Pierre") to arbitrate her claim based on a fraudulent lead[1]. That is, Pierre never visited the website that IEC claims was used to obtain her supposed consent, and even if she had, there is no enforceable arbitration agreement. As such, the Motion to Compel Arbitration should be denied.

First, there is no enforceable arbitration agreement with respect to Pierre. IEC contends that Pierre visited the CollegeAllstar website seeking information concerning a computer and network technician degree. Plaintiff denies, however, that she ever visited the website, *see* Declaration of Shana Pierre (hereafter "Pierre Decl."), a true and accurate copy of which is attached hereto as Ex. A) and IEC has proffered no evidence to connect the lead it purportedly received from CollegeAllstar to Pierre.

Second, even assuming *arguendo* that Pierre had visited the website, the declarations and website screenshots provided by IEC are insufficient to show that there was any binding arbitration agreement. Among other reasons, the Terms are contained within a browsewrap (or hybrid) agreement which is displayed in small font buried beneath a separate agreement. The arbitration clause itself is accessible only through a hyperlink that is neither capitalized nor easy to see, and there is no indication as to how a user would manifest assent to the Terms. Put simply, the CollegeAllstar website is insufficient to show an agreement to arbitrate with *any* user, Plaintiff Pierre included.

Third, the Terms do not cover Plaintiff's TCPA claim in any case. The arbitration provision only applies to disputes concerning the Terms themselves,

---

[1] Lead generation fraud continues to be a growing problem within the marketing and telemarketing industries. (*See* https://activeprospect.com/blog/what-is-lead-fraud/ (last visited October 21, 2022)). Some industry experts estimate that roughly **45 percent** of all affiliate marketing web traffic is fraudulent. (*See* https://www.anura.io/blog/how-much-fraud-do-affiliate-programs-have (last visited October 21, 2022)).

1  which make no mention of telemarketing or marketing at all. Instead, IEC's

2  supposed consent language is contained within a separate agreement.

3        Fourth, even if the Court were to find that a contract to arbitrate exists and

4  that the claims fall within its scope, IEC has no right to enforce it. IEC is a non-

5  signatory, Pierre's claims do not rely on the existence of the Terms nor are they

6  intertwined with the Terms, and Plaintiff is not otherwise estopped from denying the

7  application of such terms. As such, IEC is not in a position to compel any

8  supposedly valid arbitration agreement.

9        For these reasons, and as set forth more fully below, the Court should deny

10  IEC's motion to compel arbitration.

11  **II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY**

12  ***Plaintiff receives unwanted telemarketing calls pitching IEC's products despite***

13  ***registering on the DNC List***

14        On July 7, 2022, Plaintiff filed her Complaint, alleging violations of the

15  Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA" or "Act") against

16  Defendant IEC. (Dkt. 1.) IEC, a seller of educational products and programs,

17  conducts wide scale telemarketing in which it causes telemarketing calls and text

18  messages to be repeatedly placed to consumers whose phone numbers appear on the

19  national Do Not Call Registry ("DNC Registry") absent any prior express invitation,

20  permission, or consent. (*Id.* ¶ 6.)

21        In Plaintiff Pierre's case, she registered her cellular telephone number on the

22  DNC Registry on June 14, 2021. (*Id.* ¶ 15.) Despite her registration, beginning in

23  January 2022, IEC placed numerous calls from various telephone numbers to

24  Plaintiff soliciting her to purchase its educational programs. (*Id.* ¶¶ 17-18.) Plaintiff

25  also received at least one text messages from IEC, which promoted its educational

26  programs. (*Id.* ¶ 19.) And despite requests for the calls to stop, the calls continued.

27  (*Id.* ¶ 21.) Plaintiff never provide any prior express invitation, permission, or

28

1    consent to IEC to receive the calls and texts at issue. (*Id.* ¶ 20.)

2    ***IEC seeks to compel arbitration based on a fraudulent lead***

3        Rather than reform its telemarketing practices—let alone offer an apology—

4    Defendant IEC instead moves to compel arbitration. (Dkt. 18.) IEC's motion seeks

5    to enforce an arbitration agreement included within the Terms contained on

6    www.collegeallstar.com (hereafter "CollegeAllstar"), which is owned and operated

7    by Adwire Media.[2] (Mot. at 2.) IEC does not appear to have a relationship with

8    Adwire Media. Rather, IEC purchased the lead at issue from EducationDynamics,

9    LLC ("EducationDynamics"), a lead generation company, which contracts with

10    various digital media platforms, including Adwire Media. (*Id.*)

11        In support of its motion, IEC submitted declarations from Mark Olson,

12    president and founder of Adwire Media (dkt. 18-2); Gennifer Bostwick, the VP of

13    marketing and analytics of EducationDynamics (dkt. 18-7); and Kirsten Bohn, the

14    affiliate marketing manager of IEC (dkt. 18-9). Together, the declarations purport to

15    explain the relationship between IEC, EducationDynamics, and Adwire Media, and

16    provide supposed facts regarding the lead in question.

17        Relevant here, the declarants assert that on January 18, 2022, Plaintiff visited

18    the CollegeAllstar website[3]. (Dkts. 18-2 ¶ 5; 18-7 ¶ 6; 18-9 ¶ 7.) According to the

19    declarants, Plaintiff accessed the website using a device with an "OS X" operating

20    system and Chrome internet browser from the IP Address 73.107.27.148. (Dkts. 18-

21    2, Ex. C.; 18-9, Ex. C.) Thereafter, the declarants contend that Plaintiff answered a

22    series of questions and indicated an interest in pursuing a degree as a "Computer and

23    Network Technician" and entered personal information, including that she resides at

24    1001 Jimson Dr SE, Miami, Florida, 33137; her current level of education is G.E.D.;

25    and she graduated high school in 2012. (Dkts. 18-2 ¶ 6, Ex. B; 18-7 ¶¶ 7-8, Ex. A;

---

26

27    [2] Plaintiff will also refer to Adwire Media interchangeably with CollegeAllstar.

28    [3] The declarations also provide screenshots of how the website appeared on the date in question. (*See* Dkts. 18-3, 18-10.)

18-9 ¶ 7, Ex. B.)

After entering her information, IEC contends that Plaintiff was presented and agreed to a disclosure, which contains the arbitration clause at issue. (Mot. at 4-5; Dkts. 18-2 ¶ 10, 18-9 ¶ 9.)

### IEC's disclosure is false and misleading

Unfortunately, IEC and the declarants revised the disclosure containing the arbitration clause in their filings in a way that gives a false portrayal of the agreement. (*See* Declaration of Taylor T. Smith (hereafter "Smith Decl.") ¶¶ 3-4, attached hereto as Grp. Ex. B.) That is, IEC's filings improperly and inaccurately merge the browsewrap agreement containing the arbitration clause with a separate clickwrap agreement located directly above the agreement at issue. (*Id.*) The actual disclosure at issue states as follows:

> By clicking below, I certify that I am over the age of 18 and agree to the website Privacy Policy, Terms and Conditions and Privacy Policy (CA).

(Smith Decl. ¶ 4.)

### Pierre never visited the website

To be clear, Plaintiff Pierre claims that she never visited the CollegeAllstar website and never authorized anyone to do so on her behalf. (Pierre Decl. ¶ 2, attached hereto as Exhibit A.) While certain of her contact information is correct, much of the remaining information supposedly submitted to the website is riddled with inaccuracies. (*Id.* ¶¶ 2-10.) To begin, Plaintiff is over sixty years old, graduated high school in 1976, and obtained a Bachelor of Science degree in Sociology from Florida A&M University in 1982. (*Id.* ¶¶ 5-6.) She is not technologically savvy and has zero interest in any computer science related education. (*Id.* ¶¶ 3-4.) On January 18, 2022, when IEC claims she visited the website, the only device that she had that allowed her access to the internet was her cellphone, a Samsung A02. (*Id.* ¶ 7.)

1    Additionally, the address that IEC asserts she entered is not Plaintiff's street address.

2    (*Id.* ¶ 9.) Put simply, Plaintiff never visited the CollegeAllstar website and did not

3    agree to arbitrate the claims at issue. (*See, e.g., id.* ¶¶ 2-10.)

4        Based on these facts, the Court should deny Defendant's motion to compel

5    arbitration.

6    **III.   ARGUMENT**

7        "[A]rbitration 'is a matter of consent, not coercion.'" *Berman v. Freedom Fin.*

8    *Network, LLC*, Case No. 18-cv-01060-DMR, 2018 WL 2865561, at *1 (N.D. Cal.

9    June 11, 2018) (quoting *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662,

10   681 (2010)). A court deciding whether to compel arbitration must first determine:

11   (1) "whether a valid agreement to arbitrate exists and, if it does, (2) whether the

12   agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic*

13   *Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "If the parties contest the *existence*

14   of an arbitration agreement, the presumption in favor of arbitrability does not

15   apply." *Berman v. Freedom Fin. Network, LLC*, No. 18-CV-01060-YGR, 2020 WL

16   5210912, at *1 (N.D. Cal. Sept. 1, 2020) (quoting *Goldman, Sachs & Co. v. City of*

17   *Reno*, 747 F.3d 733, 742 (9th Cir. 2014)) (emphasis in original). Important here,

18   even in the context of internet commerce, the basic principles of contract law remain

19   the same: a mutual manifestation of assent "is the touchstone of contract." *Nguyen v.*

20   *Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).

21       In its motion, IEC briefly asserts that Florida law controls based on the choice

22   of law provision in the contract. (Mot. at 9.) This gets it slightly wrong. To start,

23   because Plaintiff disputes the very existence of a contract, there is no basis to invoke

24   the choice of law provision. *See Brooks v. IT Works Mktg., Inc.*, No.

25   121CV01341DADBAK, 2022 WL 2079747, at *4, n.2 (E.D. Cal. June 9, 2022)

26   ("Although defendants invoke Florida law under the assumption that their Terms of

27   Use's choice of law provision applies, assuming as much would presuppose that a

28

1   contract was formed, which is the very issue now before this court."). Instead, the

2   Court should apply California law to its analysis of whether a contract was formed

3   (i.e. Section A, *infra*). *See id.* IEC also fails to carry its burden to identify "material

4   differences" between California and Florida law and actually concedes that it makes

5   no difference. (Mot. at 9.) As such, the Court should apply California law. *See*

6   *Brooks*, 2022 WL 2079747, at *4, n.2 ("defendants suggest Florida law is not

7   materially different from California law by stating in a footnote that "California law

8   would yield the same result." . . . Thus, the court must apply California law.).

9         Once a court determines that a contract was formed, then it may enforce the

10   choice of law provision so long as there is a "reasonable basis" for the parties'

11   choice. *Qwest Commc'ns Co. LLC v. Sun Coast Merch. Corp.*, No. CV 10-7145 PA

12   (SSX), 2011 WL 13217684, at *4 (C.D. Cal. June 13, 2011). As such, with respect

13   to whether the scope of the arbitration clause encompasses the claims at issue and

14   whether Plaintiff should be equitably estopped from avoiding arbitration (i.e.

15   Sections B & C, *infra*)—arguments that presuppose that Plaintiff went to the

16   website and assented to certain terms—the Court should apply Florida law.

17         Ultimately, and the Court should deny IEC's motion to compel under either

18   California or Florida law. First, IEC has produced no evidence to show that Pierre

19   visited the CollegeAllstar website and agreed to any Terms. Second, even if it had,

20   the website's Terms were not displayed in a conspicuous manner sufficient to bind

21   any consumer. Third, the scope of the arbitration agreement does not encompass

22   Plaintiff's TCPA claims, and fourth, IEC, as a third-party non-signatory, cannot

23   enforce the arbitration agreement.

24       **A.**    **Plaintiff's claims are not subject to an enforceable arbitration**

25              **agreement.**

26         IEC first asserts that "Plaintiff agreed to the Terms, including its arbitration

27   provision, which constitutes a clickwrap agreement." (Mot. at 10.) This arguments

28

falls apart. First, IEC produces no evidence that Plaintiff ever visited the CollegeAllstar website in question (actually, all of its "evidence" demonstrates that the lead was fraudulent). And second, even assuming *arguendo* that Plaintiff visited the website, there is no agreement that can be enforced with respect to anyone because the Terms are contained within an unenforceable browsewrap agreement.

> 1.    **Plaintiff never visited the CollegeAllstar website or agreed to arbitrate any dispute.**

Conspicuously absent from IEC's motion to compel is any substantive explanation as to how it tied the lead from the CollegeAllstar website to Plaintiff. Instead, it appears that IEC is attempting to pass off a fraudulent lead with zero connection to Plaintiff as her web activity merely because the lead contains some of her contact information. But Plaintiff never visited the CollegeAllstar website and never agreed to the website's Terms.

As previously stated, "parties cannot be forced to arbitrate if they have not agreed to do so." *Est. of Arce by & through Huerta v. Panish Shea & Boyle LLP*, No. 19-CV-0500 AJB, 2019 WL 6218781, at *3 (S.D. Cal. Nov. 20, 2019) (citing *Volt Info. Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 478 (1989)). When considering whether the parties agreed to arbitration, "courts apply a standard similar to the summary judgment standard applied under Rule 56". *Dickey v. Ticketmaster LLC*, No. CV 18-9052-GW(GJSX), 2019 WL 9096443, at *3 (C.D. Cal. Mar. 12, 2019) (citing *Concat LP v. Unilever*, PLC, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citing *McCarthy v. Providential Corp.*, No. C 94-0627, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994))). The Court must construe "all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Stover-Davis v. Aetna Life Ins. Co.*, No. 1:15-CV-1938-BAM, 2016 WL 2756848, at *2 (E.D. Cal. May 12, 2016) (citation omitted).

Here, IEC has filed declarations asserting that Plaintiff accessed the College

Allstar Website on January 18, 2022, and inquired about a "Computer and Network Technician" diploma. (Dkt. 18-4.) IEC also contends that Pierre's current education legal is "G.E.D." and that she graduated high school in 2012. (Dkt. 18-2 ¶ 6.) But as set forth in her sworn declaration, Plaintiff denies visiting collegeallstar.com. (*See* Pierre Decl. ¶ 2.) Rather, Pierre is over sixty years old, graduated high school in 1976, and obtained a Bachelor of Science degree in Sociology from Florida A&M University in 1982. (*Id.* ¶¶ 5-6.) She had zero interest in any computer science related education in January 2022 or at any other time. (*Id.* ¶¶ 3-4.)

Furthermore, IEC fails to connect the lead in question to Plaintiff. Indeed, IEC contends that Plaintiff accessed its website from a device with an OS X operating system (dkt. 18-12), which is an operating system for a Mac or Apple device.[4] Yet, Plaintiff doesn't own an Apple or Mac device at all. (Pierre Decl. ¶ 8.) Rather, on January 18, 2022, Plaintiff had only one device with access to the internet, a Samsung A02 cellphone. (*Id.* ¶ 7.) The google search history for her device on the date in question also shows no searches to support IEC's claim. (Smith Decl. ¶ 7.) Moreover, the IP Address that IEC contends she used to access its website is associated with Comcast Cable Communications, LLC. (*See* Dkt. 18-12; Smith Decl. ¶ 9.) Pierre did not have an account with Comcast on the date in question. (Pierre Decl. ¶ 10.)

While the veracity of some of the information could not be determined absent consultation with Plaintiff, there was also obvious information that should have tipped off IEC, Adwire Media, and/or EducationDynamics that the lead was fraudulent. For example, the claimed IP Address 73.107.27.148 ties back to a location near Cape Coral, Florida, which is more than 100 miles from Miami, Florida—where Plaintiff lives (and where IEC apparently admits that she lived). (Smith Decl. ¶¶ 9-10.) Worse yet, the address 1001 Jimson Dr. SE, Miami, Florida

---

[4] https://support.apple.com/en-us/HT201260 (last visited on October 20, 2022).

33137, which IEC contends is Plaintiff's address (dkt. 18-11)—is not an address that exists in the City of Miami, Florida at all. (Smith Decl. ¶¶ 11-15.) These obvious facial issues apparently raised no concern from IEC, CollegeAllstar, or EducationDynamics.

In short, IEC fails to provide sufficient evidence to demonstrate—without any genuine issue of material fact—that Plaintiff entered into an agreement to arbitrate her claims against it.

Likely recognizing that it lacks sufficient evidence, IEC hedges by requesting, in the alternative, that it be granted special discovery and an early trial to determine whether an agreement was formed (Def. Mot. 18). There is no basis for granting such relief. While trials can be necessary in some instances, a trial in this case is unnecessary because, as explained next, there is no arbitration agreement that can be enforced by IEC even if Plaintiff did visit the CollegeAllstar website.

### 2.    CollegeAllstar.com fails to adequately notify or obtain assent to arbitrate from any user.

Even assuming *arguendo* that Plaintiff visited the CollegeAllstar website, IEC incorrectly asserts that Pierre "agreed to the Terms, including its arbitration provision, which constitutes a clickwrap agreement." (Mot. at 10.) The Terms were neither contained within a "clickwrap agreement" nor were they presented in a manner that provided notice sufficient to bind her or anyone else.

Broadly speaking, internet contracts typically fall into one of two categories: clickwrap agreements, where users are required to click on an "I Agree" box after being presented with terms and conditions; and browsewrap agreements, where terms and conditions are posted via hyperlink at the bottom of a webpage. *Nguyen*, 763 F.3d at 1175-76. In some cases, websites present a hybrid of these two categories (sometimes referred to as "hybridwrap" or "sign-in wrap" agreements) by notifying the user of the existence of terms of conditions and, "instead of providing

an 'I agree' button, advis[ing] the user that he or she is agreeing to the terms of service when registering or signing up." *Snow v. Eventbrite, Inc.*, No. 3:20-CV-03698-WHO, 2021 WL 3931995, at *3 (N.D. Cal. Sept. 2, 2021).

The Ninth Circuit has previously addressed hybrid agreements, to which it applied browsewrap principles:

> Courts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website. . . .

> But where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract. Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage.

*Nguyen*, 763 F.3d at 1176–77 (citations omitted); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). An enforceable contract based on inquiry notice can only be found where: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856 (citation omitted).

In *Berman*, the Ninth Circuit set out a framework regarding what constitutes "reasonably conspicuous notice", and declined to enforce a hybrid agreement similar to the agreement at issue in this case. *Id.* First, to be conspicuous the notice "must be displayed in a font size and format such that the court can fairly assume

that a reasonably prudent Internet user would have seen it." *Id.* In *Berman*, the font was printed in "tiny gray font considerably smaller than the font used in the surrounding website elements." *Id.* The "comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else." *Id.*

Second, while terms may be disclosed through a hyperlink, "the fact that a hyperlink is present must be readily apparent." *Id.* at 857. "Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Id.* Rather, utilizing "contrasting font color (typically blue) and the use of all capital letters" can alert a user the text provides a pathway to another webpage. *Id.* Put simply, "[c]onsumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'" *Id.*

*Berman* also addressed what constitutes an "unambiguous manifestation of assent". The defendant claimed that clicking a large "continue" button was sufficient to manifest assent where the terms were "directly above the button". *Id.* at 857-858. But "even close proximity of the hyperlink to relevant buttons users must click on— without more—is insufficient to give rise to constructive notice." *Id.* at 858 (quoting *Nguyen*, 763 F.3d at 1179). Rather, the text notice "must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* As the Ninth Circuit explained, the defect could have easily been cured "by including language such as, "By clicking the Continue >> button, you agree to the Terms & Conditions." *Id.*

In this case, the agreement at issue is not, as IEC contends (mot. at 10), a "clickwrap" agreement. Rather, the agreement at issue is a browsewrap (or hybrid) agreement. A reproduction of the agreement is below.

(Dkt. 18-3, pg. 5.)[5] As highlighted above, the Terms that IEC seeks to bind Plaintiff to are set off as a separate paragraph from the agreement above.[6] As further evident from the plain language, the first agreement begins with "By checking this box" and then provides a box to the left to check. This is a clickwrap agreement. Conversely, the agreement that includes the Terms that IEC seeks to bind Plaintiff begins with "By clicking below" (it doesn't specify where) and is set off as a separate paragraph.

This agreement is substantially similar to the agreements analyzed in the *Berman* case, one of which also includes a clickwrap and a browsewrap. *See Berman*, 30 F.4th at 859, Appendix A; *see also Berman* Disclosures, attached as Exhibit 5 to Smith Decl.). Similar to *Berman*, the terms of the agreement are in small font and buried below the initial clickwrap agreement. (*See* Dkt. 18-3 pg. 5.) By contrast, the "NEXT STEP" button is in significantly larger font and set off on an orange button. (*Id.*) The font is also smaller than the information relating to financial aid to the left, which naturally draws consumers' focus anywhere but the Terms. (*Id.*) Second, the "Terms and Conditions" hyperlink is also not readily

---

[5] The image is cropped, and the red box was added by Plaintiff's counsel to enable the Court to easily review the terms. An actual reproduction of how the terms were presented to consumers can be found at Dkt. 18-3 at pg. 5.

[6] Unfortunately, IEC has **altered** the disclosure in its brief (and supporting declarations) by removing the spacing between the end of the first agreement and the "By clicking below" phrase of the second agreement. (*Compare* Mot. at 5, Dkt. 18-2 ¶ 10, Dkt. 18-9 ¶ 9, *with* Smith Decl. ¶¶ 3-4 and Dkt. 18-3 pg. 5.) The purpose is obvious: IEC is attempting to merge the browsewrap (or hybrid) agreement with the prior clickwrap agreement. The Court deserves a clear record.

apparent. While the hyperlink is in an ever so slightly different shaded font, it is neither capitalized nor is it set off in the typical blue color, which would denote the existence of a hyperlink. (*Id.*) The Terms are even less noticeable than the terms and conditions links analyzed in *Berman*. (*Compare* Exhibit 5 to Smith Decl., *with* Exhibit 6 to the Smith Decl.)

Also lacking is an unambiguous manifestation of assent. While the language does state that "By clicking below" the user agrees to the Terms, just as in *Berman*, the language does not "explicitly notify a user of the legal significance of the action she must take" to be bound. Also like *Berman*, the defect would be easily remedied by including the phrase "by clicking the NEXT STEP button below". On its own, however, the phrase "next step" would not suggest to a reasonable user that they are manifesting assent to any agreement. Rather, a reasonable user would expect to continue with the website's process (which continues on three subsequent pages).

As a final point here, "[w]ebsite users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. And because online providers have "complete control" over their website's design, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers". *Id.* (quoting *Nguyen*, 763 F.3d at 1179). As explained above, the CollegeAllstar Website falls far short. While it could have included a second check box to manifest the assent to the Terms, highlighted and capitalized the hyperlink, and increased the font size, it contains none of those key elements.

In short, the CollegeAllstar Website did not provide its consumers adequate notice of its Terms, including the mandatory arbitration clause. Without adequate notice, Plaintiff could not have manifested assent to those terms (even if IEC could show she ever visited the website), and there is no enforceable agreement to

1    arbitrate her claims. Accordingly, Defendant's Motion should be denied.

2        **B.**      **Even if the website's terms were enforceable, Plaintiff's claim**

3                  **would fall outside the scope of the purported agreement.**

4        IEC next asserts that Plaintiff's TCPA claim "falls within the scope of the

5    arbitration provision." (Def. Mot. at 12.) This is incorrect.

6        First, IEC argues that the Agreement "must be interpreted liberally" to

7    promote "the strong public policy in favor of arbitration". (Def. Mot. at 11.) Not so.

8    The FAA's "policy favoring arbitration" does not permit courts to invent "special"

9    rules. *See Morgan v. Sundance, Inc.*, 212 L. Ed. 2d 753, 142 S. Ct. 1708, 1713

10    (2022) (citation omitted). The "policy" is an acknowledgment of the FAA's

11    commitment to make "arbitration agreements as enforceable as other contracts, but

12    not more so." *Id.* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388

13    U.S. 395, 404, n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)). Put simply, "[t]he

14    federal policy is about treating arbitration contracts like all others, not about

15    fostering arbitration." *Id.* (citations omitted). Indeed, it is well-settled in this Circuit

16    that arbitration agreements should not receive favorable treatment compared to other

17    contracts. *See Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir.

18    2014) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2859

19    (2010)) (the FAA's policy is to "overrule the judiciary's longstanding refusal to

20    enforce agreements to arbitrate and to place such agreements upon the same footing

21    as other contracts.").

22        For this reason, arbitration does not apply if "contractual language is plain

23    that arbitration of a particular controversy is not within the scope of the arbitration

24    provision." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044–45 (9th Cir.

25    2009) (internal quotation omitted). Arbitration is a matter of contract and "a party

26    cannot be required to submit to arbitration any dispute which he has not agreed so to

27    submit." *Esparza v. SmartPay Leasing, Inc.*, 765 F. App'x 218, 219 (9th Cir. 2019)

28

1    (citation omitted).

2         Applied here, the language of CollegeAllstar's arbitration clause is limited

3    and applies only to "this Agreement, the terms and conditions of this Agreement or

4    the breach of same." (Dkts. 18-6; 18-13.) Even construing this language broadly, it

5    does not cover Plaintiff's TCPA claim, which challenges unsolicited phone calls,

6    not any agreement, terms and conditions of the agreement, or breach of the same.

7         The Eleventh Circuit considered and rejected a similar argument that because

8    a TCPA consent disclosure was placed in the same document as a loan agreement

9    the claim was related to the loan agreement. *See Gamble v. New England Auto Fin.,*

10   *Inc.*, 735 F. App'x 664, 667 (11th Cir. 2018). But the inclusion of both agreements

11   into one document did not place the TCPA claim within the scope of the agreement:

12        NEAF cannot force Ms. Gamble to arbitrate her TCPA claim just

13        because the contract she entered into with NEAF, a contract that had

14        nothing to do with the TCPA or with text messages, contained a

15        separate provision, with a separate signature line, requesting Ms.

16        Gamble's consent. NEAF cannot avoid the strictures of the TCPA, and

17        force arbitration of its alleged TCPA violations, by placing the request

18        for consent to receive text messages in the same document as, but after

19        and apart from, a separate and independent contract, and then, after it

20        failed to get the individual's consent, claim that the consent request was

21        actually part of that contract. We will not accept NEAF's invitation to

22        bootstring independent TCPA claims to a completely distinct contract.

23   *Id.* The United States District Court for the District of Arizona recently considered

24   even broader language—any claims that "arise out of or relate to this Agreement or

25   any resulting transaction or relationship"—that a defendant insisted covered TCPA

26   claims. *Briggs v. PFVT Motors LLC*, No. CV-20-00478-PHX-GMS, 2020 WL

27   8613676, at *2 (D. Ariz. Sept. 9, 2020). Yet not even this language could be taken to

28

cover subsequent telemarketing:

> Here, the arbitration clause does not encompass the dispute at issue. The subject of this suit does not "touch matters" covered by the Agreement because this suit is the result of Defendant's extra-contractual actions, unrelated to the promises outlined in the parties' contract. The Agreement was for the purchase of a vehicle, and this suit concerns Defendant's subsequent attempts to solicit new business. Although courts interpret arbitration agreements broadly, they must be bound by some limiting principle which excludes wholly unrelated conduct between the parties. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205 (1991) ("The object of an arbitration clause is to implement a contract, not to transcend it."); *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003) (explaining that "absurd results ensue" from an unlimited arbitration clause, such that if a defendant murdered the plaintiff in order to discourage default on a loan, the wrongful death claim would have to be arbitrated).

*Id.*

In the instant case, the language in CollegeAllstar's clause does not encompass Plaintiff's TCPA claim. The calls and texts received were extra-contractual conduct and an attempt by IEC (a nonparty to the agreement) to solicit business for *its* services. By contrast, the Terms do not mention telemarketing, marketing, or phone calls at all. (Dkts. 18-6; 18-13.) In fact, the clause does **not** cover all disputes between the parties or even all disputes relating to the website. (*Id.*) Rather, the clause is specific that only disputes concerning the Terms and Conditions are covered. And, as explained in Section A.2 *supra*, CollegeAllstar's agreement containing its consent to place telemarketing calls and texts is encompassed in a ***separate*** clickwrap agreement on a subsequent page. (Dkts. 18-3

pg. 6.) As was the case in *Gamble,* the calls and texts at issue did not arise out of, or even relate to, the Terms, and Plaintiff's claim does thus not fall within the alleged agreement to arbitrate.

Yet even the Court finds that the Terms encompass telemarketing activity, the agreement still cannot be read to encompass telemarketing calls placed by IEC, an unrelated third party. *Revitch v. DIRECTV, LLC* is instructive. In that case, the Ninth Circuit considered whether the phrase "References to 'AT&T,' 'you' and 'us' include our respective ... affiliates ...." was broad enough to encompass DirecTV, LLC, who became an affiliate of AT&T after the agreement was executed. *See id.*, 977 F.3d 713, 717 (9th Cir. 2020). The Court looked "to the reasonable expectation of the parties **at the time of contract**." *Id.* (citation omitted) (emphasis added). Ultimately, the Court held that DirecTV could not enforce AT&T's arbitration agreement with the plaintiff. *Id.* at 718. In doing so, the Court observed that it "might arrive at a difference conclusion" had the agreement referred to "any affiliates, both present and future". *Id.*

Unlike *Revitch*, the Terms at issue do not contain any reference to third parties, affiliates, partners, etc. (Dkts. 18-6; 18-13.) In fact, the Terms actually include a disclaimer regarding third party links and warns consumers that the inclusion of the links "does not imply endorsement by CollegeAllStar.com." (*Id.*) Put simply, at the time the agreement is presented to the consumer, CollegeAllstar had not disclosed IEC in any form. Instead, as Defendant admits, consumers are "matched" on subsequent pages. (Dkt. 18-2 ¶ 11.) Hence, at the time the Terms are presented to the consumer, no reasonably consumer could expect to arbitrate claims against any third party, let alone a third party that was not disclosed at the time of the agreement.

Accordingly, even if the Court finds that an agreement to arbitrate exists, it does not encompass the TCPA claim at issue in the Complaint. The motion should

1    be denied.

2         **C.    IEC cannot enforce the arbitration agreement—it is a nonparty to**

3              **the supposed agreement, and Pierre has done nothing to equitably**

4              **estop her from denying the agreement's application to her claims.**

5              Defendant next asserts that as a nonsignatory it has a "has a right to compel

6    arbitration" based only on equitable estoppel. (Def. Mot. at 12-14.) This is also

7    untrue.

8              Under Florida law, "a non-signatory to a contract containing an arbitration

9    agreement ordinarily cannot compel a signatory to submit to arbitration. *Drayton v.*

10   *Toyota Motor Credit Corp.*, 686 F. App'x 757, 758 (11th Cir. 2017) (citing *Marcus*

11   *v. Fla. Bagels, LLC*, 112 So.3d 631, 633 (Fla. Dist. Ct. App. 2013)). An exception is

12   equitable estoppel. *Id.* The "equitable estoppel doctrine has been found to apply

13   when one party attempts to hold [another party] to the terms of [an] agreement

14   while simultaneously trying to avoid the agreement's arbitration clause.'' *Id.* at

15   758–59. In *Drayton*, the Eleventh Circuit considered whether a consumer can be

16   compelled to arbitrate her TCPA claim against Toyota based on agreement between

17   the consumer and the dealership. *Id.* at 758. The *Drayton* court denied Toyota's

18   motion to compel arbitration by explaining that "equitable estoppel is not

19   appropriate for this case because Drayton is not seeking to hold Toyota to the terms

20   of the [agreement]." *Id.* at 789. Indeed, courts repeatedly decline to compel

21   arbitration of TCPA claims where the claims were "not based on the terms of the

22   Agreement." *Mims v. Glob. Credit & Collection Corp.*, 803 F. Supp. 2d 1349, 1358

23   (S.D. Fla. 2011); *see also Johnson v. Westlake Portfolio Mgmt., LLC*, No. 8:20-CV-

24   749-T-24 AEP, 2020 WL 5526386, at *3 (M.D. Fla. Sept. 15, 2020) (refusing to

25   compel arbitration of a TCPA claims because the claims are not based on the

26   underlying agreement).

27              The same applies here. Pierre's claims do not seek to hold IEC to the terms of

28

the agreement. Rather, IEC is attempting to invoke the third agreement with respect
to its *defense*. Perhaps recognizing that the Terms are immaterial to its consent
defense, IEC asserts that the claims are "intertwined with or arises from her contract
with CollegeAllstar". (Mot. at 13.) Again, this is false. As explained repeatedly,
there are **three** separate agreements at play in this case: First, there is the clickwrap
agreement to receive calls from CollegeAllstar at presented as Step 4 of its
website's process. (Dkt. 18-3 pg. 5.) Second, there is the browsewrap agreement (as
discussed in Section A, *supra*), which contains the arbitration clause. (*Id.*) And
third, on a subsequent page, there is an agreement to receive telemarketing calls or
texts from IEC. (Dkt. 18-3 pg. 6.) Only the third agreement has any applicability to
the claims or defenses in this case. The Terms at issue do not mention or include
any terms relating to telemarketing or marketing in general. But regardless of the
agreement analyzed, Plaintiff doesn't seek to hold IEC to a single term contained
within any of the three separate agreements.

Additionally, IEC's defense likewise does not render the claims
"interdependent" with the Terms. The claims asserted against IEC are based entirely
on extra-contractual interactions by IEC. None of the claims asserted are based on
misconduct "by both the nonsignatory and one or more of the signatories to the
contract." *Mims*, 803 F. Supp. 2d at 1358 (finding that plaintiff's TCPA claims are
not based on "interdependent and concerted misconduct" by defendant <u>and</u> a
signatory); *see also Rahmany v. T-Mobile USA Inc.*, 717 F. App'x 752, 753 (9th Cir.
2018) (declining to enforce an arbitration agreement in a TCPA case and explaining
that even though the court may need to analyze the agreement with respect to the
defendant's consent *defense*, the plaintiff's *claims* are not "interdependent" with the
obligations under the agreement).

In short, Plaintiff did not enter into an agreement to arbitrate her claims
against CollegeAllstar. Even if she had done so, IEC cannot invoke the doctrine of

1 equitable estoppel to enforce the arbitration agreement because Plaintiff does not

2 seek to enforce any portion of the Terms and the claims are not interdependent with

3 the Terms.

4           **D.**     **The Court should refuse to grant IEC a special trial on its**

5                   **arbitration defense.**

6        For its final argument, Defendant requests in the alternative that if a genuine

7 issue of material fact exists regrading whether there was a valid arbitration

8 agreement, "the Court stay the proceedings for the parties to conduct limited

9 discovery and a bench trial on the limited issue of whether a valid arbitration

10 agreement exists." (Mot. at 18-19.) A trial in this case is unnecessary. Plaintiff never

11 visited the website and, even if she had, there is no arbitration agreement that can be

12 enforced by IEC. Try as it may, IEC shouldn't be allowed to avoid liability for its

13 naked violations of the TCPA by having the case sent to mandatory arbitration

14 under a contract that was never entered into and wouldn't cover the claims at issue

15 against IEC even if it had been.

16 **IV.**    **CONCLUSION**

17        IEC's Motion to Compel Arbitration should be denied in its entirety. Plaintiff

18 denies ever visiting the CollegeAllstar website. And even if she did, the website's

19 terms, including the arbitration provision, are unenforceable. Nevertheless, even if

20 the terms were enforceable, the scope of the arbitration clause does not encompass

21 Pierre's TCPA claims. And finally, because the TCPA claims in this case are not

22 premised on the website terms, IEC cannot enforce the arbitration agreement based

23 on the doctrine of equitable estoppel.

24        Accordingly, the Court should deny IEC's motion, permit the parties to

25 proceed, and award any such relief as it deems necessary and just.

26

27                         Respectfully submitted,

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHANA PIERRE**, individually and on behalf of all others similarly situated,

Dated: October 27, 2022

<u>/s/ Taylor T. Smith</u>
One of Plaintiff's Attorneys

Aaron D. Aftergood (239853)
   aaron@aftergoodesq.com
The Aftergood Law Firm
1880 Century Park East, Suite 200
Los Angeles, CA 90067
Telephone: (310) 550-5221
Facsimile: (310) 496-2840

Taylor T. Smith (*admitted pro hac vice*)
   tsmith@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 East Mexico Avenue, Suite 300
Denver, Colorado 80210
Telephone: (720) 907-7628
Facsimile: (303) 927-0809

*Counsel for Plaintiff and the Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above titled document was served upon counsel of record by filing such papers via Court's ECF system on October 27, 2022.

<u>/s/ Taylor T. Smith</u>